IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

SEP 0 3 2025

Nathan Ochsner, Clerk of Court

DEBORAH SWAN,
 Plaintiff,

v.

DEPUTY WALTER "W." SHIELDS, Individually and in his Official Capacity;
 MONTGOMERY COUNTY CONSTABLE PRECINCT 3; and
 MONTGOMERY COUNTY, TEXAS,
 Defendants.

Civil Action No. 4:25-cv-02799
(related caption as already assigned)

# PLAINTIFF'S THIRD AMENDED COMPLAINT AND BENCH TRIAL

Plaintiff respectfully requests leave of Court to file the attached Third Amended Complaint. Good cause exists for this amendment because additional causes of action have surfaced from Defendants' own records entered into this case. These newly revealed facts materially impact Plaintiff's claims and are integral to a complete adjudication of the issues before the Court.

Plaintiff Deborah Swan ("Plaintiff" or "Swan"), proceeding pro se, files this Third Amended Complaint pursuant to 42 U.S.C. § 1983 and the First, Fourth, and

Fourteenth Amendments to the United States Constitution against Deputy Walter Shields, Montgomery County Constable Precinct 3, and Montgomery County, Texas, and would show:

# I. PARTIES

1. Plaintiff Deborah Swan is an adult resident of Montgomery County, Texas.

2. Defendant Deputy Walter "W." Shields ("Shields") is a licensed Texas peace officer employed by Montgomery County Constable Precinct 3 ("PCT3"). He is sued in his individual and official capacities. He may be served at PCT3, 1520 Lake Front Cir., Suite 200, The Woodlands, TX 77380, or wherever found.

3. Defendant Montgomery County Constable Precinct 3 is a county law-enforcement agency and suable entity under § 1983 for policies, customs, practices, ratification, failure to train/supervise, and maintenance of unconstitutional information systems. Service may be made through the elected Constable at the address above.

4. Defendant Montgomery County, Texas ("County" or "MCTX") is a Texas county and suable municipal entity under § 1983 for Monell liability and ratification. It may be served by serving the Montgomery County Judge, Hon. Mark J. Keough, 501 N. Thompson, Suite 401, Conroe, TX 77301.

# II. JURISDICTION AND VENUE

5. The Court has federal-question jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3)-(4). Supplemental jurisdiction exists under 28 U.S.C. § 1367 for related state-law claims, if any.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside here and the events giving rise to the claims occurred in the Southern District of Texas.

# III. FACTUAL BACKGROUND COMMON TO ALL COUNTS

7. Plaintiff is a licensed private investigator, legal researcher, and pro se litigant who has engaged in protected speech and petitioning activity, including reporting cyberstalking, data intrusions, and misconduct to law enforcement. See, e.g., June 2024 email to Detective Durrenberger (Ex. A-1).

8. In early 2024, Plaintiff discovered that her private email accounts were being repeatedly accessed from unauthorized IP addresses and GPS-tracked locations. Microsoft metadata activity logs confirmed a pattern of hundreds of unauthorized log-ins over months.

9. Plaintiff deliberately refrained from changing her passwords at first, to establish a pattern of access, then downloaded and preserved the metadata reports, showing exact dates, times, and geographic origins.

10. Plaintiff reported these findings and reached out to Detective Durrenberger of the Montgomery County Sheriff's Office, submitting her evidence of cyberstalking and GPS tracking. Plaintiff acted in good faith, seeking official investigation.

11. 10A. On May 31, 2024, Plaintiff attempted to file a formal report with Montgomery County Constable Precinct 3 deputies regarding the ongoing cyberstalking, email intrusions, and GPS tracking activity. Despite Plaintiff's detailed account and documentation, the deputies refused to prepare or file a report.

12. Instead of taking action, the deputies advised Plaintiff to simply "change her password" and then departed the scene without opening an investigation or memorializing her complaint.

13. In response to this refusal, Plaintiff decided to notify her neighbors directly of the suspicious activity. She drafted and delivered a written letter to each nearby residence by placing it in their mailboxes, explaining that unauthorized access to her accounts was originating from the neighborhood.

14. Immediately after these letters were delivered to her neighbors, the suspicious account activity stopped completely, corroborating Plaintiff's evidence and confirming that the activity was in fact emanating from within the neighborhood.

15. Despite this, law enforcement failed to act. Instead, Defendants particularly Deputy Shields, fabricated incident records that falsely branded Plaintiff as "10-96 Dangerous/Mentally Ill" and "politically delusional."

16. Plaintiff later confirmed that 1323 Jander Drive, Montgomery County, Texas was not a private residence but an HOA parking lot near her subdivision. Plaintiff's neighbor has observed that constables, including Deputy Shields, routinely parked their vehicles in this lot and used the HOA's Wi-Fi network.

17. Metadata logs confirmed that Plaintiff's email accounts were accessed via this Wi-Fi network during times she was not present, supporting the inference that Shields and others used the HOA Wi-Fi while accessing her private email accounts. .

18. Rather than conduct any investigation, Defendant Shields retaliated by fabricating false 1096 mental health profile with "political delusions."

CAD/dispatch entries.

19. On June 7, 2024, Defendant Shields dispatched a mental health officer to conduct a welfare check at Plaintiff's residence. Officer Holman arrived by himself and determined that Plaintiff exhibited no signs of mental illness, posed no danger to herself or others, and did not meet the criteria for emergency detention under Texas law. The encounter was brief, non-confrontational, and concluded without incident in under ten minutes

20. Immediately after the welfare check was concluded by Deputy Holman, who determined that Plaintiff exhibited no signs of mental illness and did not meet the criteria for emergency detention, Defendant Walter Shields, who was not present at the scene and had no direct contact with Plaintiff, contacted dispatch and instructed personnel to enter a caution code 1096 into the official CAD database. Specifically, Defendant Shields caused Plaintiff to be flagged as "10-96" (dangerous/mentally ill) and falsely labeled her as "politically delusional." These entries were made without any medical evaluation, lawful justification, or firsthand observation, and directly contradict the findings of the responding mental health officer, Deputy Holman.

21. Plaintiff was not made aware of the false and defamatory dispatch entry until she submitted a public information request seeking records related to the June 7, 2024 welfare check, specifically to identify who initiated the call. Upon reviewing the CAD log and associated dispatch records, Plaintiff discovered that an individual named "W. Shields"—who was not present at the scene, has never met or spoken with Plaintiff, and played no role in the welfare check itself, had entered or caused to be entered a "10-96" caution code into the incident report. This entry falsely labeled Plaintiff as dangerous, mentally ill and "politically delusional," despite the fact that the responding officer, Deputy Holman, made no such determination and explicitly cleared the encounter without incident.

22. June 12, 2024, Following Plaintiff's discovery of the unauthorized and defamatory dispatch entries, Plaintiff filed a formal complaint with Montgomery County law enforcement. In response, Plaintiff received a phone call from Captain Atkins, who acknowledged receipt of the complaint and confirmed that the matter had been reviewed internally. However, no corrective action was taken to remove the false "10-96" designation or the notation labeling Plaintiff as a code 1096 "politically delusional," despite clear evidence that Deputy Shields was not present during the welfare check and had no direct contact with Plaintiff.

23. Captain Michael Atkins later in recorded calls that:

A. Shields' 10-96 and "politically delusional" entries were based on personal opinion;

B. No statutory process or medical evaluation supported them;

C. The office has no removal process for false entries once made. (Ex. B, Atkins Transcript).

24. Following her initial discovery of the false "10-96" designation, Plaintiff began submitting formal public information requests to obtain copies of all dispatch calls and incident reports associated with her name, address, and any entries made by Deputy W. Shields. Through this process, Plaintiff uncovered multiple additional fabricated incident reports, each falsely labeling her as mentally ill and "politically delusional." These entries were created by Deputy Shields, who had no direct contact with Plaintiff. Specifically, Plaintiff identified false dispatch entries dated June 8, 2024; June 14, 2024; and June 23, 2024, all of which contained the same defamatory 10-96 profile and politically charged notations. These records

demonstrate a sustained pattern of retaliatory profiling and abuse of dispatch authority.

25. Plaintiff also submitted a formal public records request to the Texas Attorney General's Office under the Freedom of Information Act (FOIA) to obtain copies of any reports filed by Deputy Walter Shields. However, the request was denied after Deputy Shields invoked an exemption and submitted a fabricated report to the Attorney General. In this altered version, Shields added his name alongside Deputy Holman's on the June 7, 2024, welfare check report, despite not being present at the scene. The defendant falsely listed himself as the responding officer and falsely characterized the welfare check as a criminal investigation. This misrepresentation was used to justify withholding the records from Plaintiff, obstructing her access to fabricated dispatch entries and incident reports directly involving Shields. The submission of a falsified report to a state oversight agency constitutes a serious breach of public trust and further evidences a pattern of misconduct designed to conceal retaliatory profiling and abuse of authority.

26. Through Defendants' filings in this litigation, Deputy Shields has admitted that he:

A. Contacted the plaintiff's neighbors and instructed them to monitor and document her daily activities. These communications, made without lawful justification or investigative authority, were part of a broader pattern of targeted surveillance and reputational harm. Shields' actions encouraged private individuals to treat Plaintiff as a public safety threat, despite no evidence of criminal behavior or mental instability. This unauthorized coordination with civilians further amplified the false narrative initiated through dispatch records and contributed to Plaintiff's social isolation, emotional distress, and ongoing civil rights violations.

B. Placed an official "10-96 Dangerous/Mentally Ill" caution flag on Plaintiff's name and home address;

C. Created additional fabricated "incidents" in the official dispatch database, making it appear that Plaintiff had multiple interactions with Shields, when in fact she had not;

D. Repeatedly profiled Plaintiff as "10-96" with added notations of "political delusions";

E. Acknowledged that Montgomery County Constables mocked Plaintiff for wearing a Donald Trump hat, revealing political bias; and

F. Contacted the Plaintff's neighbors and told them to if the Plainff is anywhere near their house to lock the doors and contact the Defendants.

G. Fabricated false statements in dispatch entries claiming that Plaintiff was "afraid the Democrats want to harm her," a statement Plaintiff never made.

27. These admissions demonstrate not only that Shields acted with malice and political animus, but also that he used official law-enforcement databases to create a false narrative of repeated contacts and delusional political fears. This conduct amplified the stigma attached to Plaintiff's name, increased her risk of escalated law-enforcement encounters, and constituted defamation, fabrication of records, and retaliation for her protected speech and political associations.

28. Plaintiff has never been diagnosed with or adjudicated as mentally ill, never transported under Texas Health & Safety Code Chapter 573, and never exhibited conduct meeting statutory danger criteria.

29. The false entries stigmatize Plaintiff and alter her legal status in law enforcement databases, exposing her to escalated police encounters, reputational harm, and chilling of speech.

30. The County and PCT3 ratified and maintain these false entries and have refused to expunge them.

# IV. CAUSES OF ACTION

### Count 1 First Amendment Retaliation (42 U.S.C. § 1983)

(Against Shields; and Against PCT3 and County under Monell)

31. Plaintiff engaged in protected speech (reports/complaints; political viewpoints).

32. Adverse actions followed: Shields branded Plaintiff "10-96 Dangerous/Mentally Ill" dangerous and "politically delusional" in CAD, and Defendants maintained those entries.

33. Causation/retaliatory motive: The timing and content (explicit reference to politics) show the adverse actions were substantially motivated by Plaintiff's protected activity. See, e.g., *Hartman v. Moore*, 547 U.S. 250 (2006).

34. The actions would chill a person of ordinary firmness from continuing to speak and petition.

34 a. Monell: PCT3 and the County ratified Shields' conduct (Atkins admissions of opinion-based entry and no removal process) and maintain policies/customs permitting stigmatizing caution codes without objective verification, due process, or expungement, which were the moving force of the violation.

### Count 2 Fourteenth Amendment Due Process ("Stigma-Plus") (42 U.S.C. § 1983)

(Against All Defendants)

35. Defendants published stigmatizing false information in government databases (10-96; "politically delusional") plus imposed a material alteration of legal status, subjecting Plaintiff to future heightened law-enforcement danger protocols and loss of liberty interests without due process. See *Paul v. Davis*, 424 U.S. 693 (1976) (stigma-plus).

36. No notice, hearing, medical evaluation, or statutory procedures preceded the labeling; no removal mechanism exists.

37. Monell: The County and PCT3 policies/customs permit and retain such labels absent process; leadership ratified non-medical, opinion-based branding that cannot be corrected.

(Against All Defendants)

38. The false "dangerous/mentally ill" flag predictably triggers escalated police contacts and restraints tantamount to continuing constructive seizures unsupported by probable cause. See principles in *Brower v. County of Inyo*, 489 U.S. 593 (1989) (seizure by means intentionally applied); cf. *Stripling v. Jordan Prod. Co.*, 234 F.3d 863 (5th Cir. 2000).

39. Shields intentionally applied a continuing restraint via false database entries; PCT3 and the County maintain and disseminate them to effect future restraints.

**Count 3 Monell Liability: Policy/Custom, Failure to Train/Supervise, and Ratification (42 U.S.C. § 1983)**

(Against PCT3 and Montgomery County)

40. Defendants maintain policies/customs allowing placement and retention of stigmatizing caution codes without: (a) objective criteria; (b) medical evaluation;

(c) notice/opportunity to challenge; or (d) removal/expungement procedures.

41.    Defendants failed to train/supervise regarding THSC Ch. 573 limits, due-process obligations for caution flags, and documentation/removal protocols, despite obvious need and known risks of misuse.

42.    Leadership ratified the challenged conduct (Atkins admissions: opinion-based entry; no removal path), making the policy/custom the moving force of the violations. See *City of Canton v. Harris*, 489 U.S. 378 (1989); *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997).

**Count 4 Declaratory and Injunctive Relief (42 U.S.C. §§ 1983, 2201–2202)**

(Against All Defendants)

43.    An actual controversy exists as the false caution entries continue to be maintained and disseminated. Plaintiff seeks declaratory judgment that the entries and retention violate the First, Fourth, and Fourteenth Amendments, and injunction requiring immediate removal/expungement of "10-96" and "politically delusional" notations and implementation of due-process safeguards (notice, evidence standards, review, and removal procedure).

# ADDITIONAL STATE-LAW CLAIMS

**Count 5 Defamation (Libel and Slander Per Se) Texas Common Law**

(Against Deputy Walter "W." Shields, Individually) Plaintiff realleges all prior paragraphs.

44.    Actionable statements. Shields published to third parties (including law-enforcement personnel, dispatch, other agencies, and any recipient systems) false statements of fact about Plaintiff, including that she is "10-96 Dangerous/Mentally Ill" and "politically delusional," via CAD/dispatch entries and

incident narratives (the "Defamatory Statements").

45,   Publication. The Defamatory Statements were entered into official systems and disseminated to third parties in the ordinary course of police operations and information-sharing.

46.   Falsity/Fault. The Defamatory Statements are false. Shields made and/or caused them to be made knowingly, recklessly, or at least negligently, without medical evaluation, statutory process, or factual basis.

Defamation per se. The Defamatory Statements:

   a. Impute professional unfitness and moral turpitude that necessarily injure Plaintiff in her occupation as a licensed private investigator and legal researcher; and

   b. Portray Plaintiff as dangerous and mentally ill, tending to expose her to public hatred, contempt, ridicule, or financial injury, and predictably trigger escalated police responses. Damages are thus presumed under Texas law.

---

**Count 6 Common-Law Fraud by Fabrication of Incident/Dispatch Reports**

(Against Deputy Walter "W." Shields, Individually and official capacity)

47.   Plaintiff realleges all prior paragraphs.

48.   Material misrepresentations.

Shields made material false statements and omissions in incident reports and CAD/dispatch records, falsely branding Plaintiff "10-96 Dangerous/Mentally Ill" and "politically delusional," and implying facts of dangerous conduct and mental-health adjudication that did not exist.

49. Knowledge/intent.

Shields knew these statements were false or made them recklessly without knowledge of their truth, and intended that others (officers, dispatchers, agencies, prosecutors, and decision-makers) rely on them to treat Plaintiff as dangerous/mentally ill.

50. Reliance and causation.

Third parties reasonably relied on Shields' fabricated entries in the course of official duties, which foreseeably and proximately will cause Plaintiff injury including escalated police protocols, reputational and professional harm, emotional distress, and economic loss. To the extent Plaintiff herself took actions in response to the fabricated records (to avoid risk and to remediate), Plaintiff's reliance also caused out-of-pocket expense and other damages.

51. Damages and exemplary damages.

Plaintiff suffered pecuniary and non-pecuniary damages. Because the fabrication was fraudulent, Plaintiff seeks exemplary damages.

52. Pled in the alternative: To the extent the Court deems direct reliance required, Plaintiff alleges fraud by proxy/indirect reliance. Shields intended and achieved reliance by third parties in a manner targeted to harm Plaintiff, satisfying causation; or, alternatively, negligent misrepresentation (Restatement § 552) based on supplying false information for guidance in official decisions foreseeably affecting Plaintiff.

## Reservation on Sovereign/Governmental Immunity; Injunctive/Declaratory Relief Preserved

53. Plaintiff's damages claims for intentional torts (defamation/fraud) are asserted against Shields in his individual capacity only, recognizing that the Texas Tort Claims Act generally excludes intentional torts from waivers of immunity for governmental units (Tex. Civ. Prac. & Rem. Code § 101.057).

54. Plaintiff's existing claims for declaratory and injunctive relief compelling removal/expungement of the false entries and implementation of due-process safeguards remain asserted against PCT3 and Montgomery County (ultra vires/Monell theories), as pleaded above.

55. To the extent required, Plaintiff has provided, or Defendants possess, actual notice of the claims. These claims arise from a continuing publication/maintenance of false records.

## V. ADDITIONAL AUTHORITY AND STATUTORY CLARIFICATION

56. THSC Chapter 573 authorizes emergency detention only upon probable cause of recent dangerous conduct, followed by transport, medical evaluation, and judicial oversight. See THSC §§ 573.001–.022. It does not authorize unilateral, standing CAD labels branding a person "dangerous/mentally ill" absent detention/evaluation.

57. Shields performed none of the statutory steps; he instead falsely branded Plaintiff in centrally shared databases, outside THSC process, thereby triggering constitutional harms without due process.

# VI. INJURIES AND DAMAGES

58.    As a direct and proximate result of Defendants' acts/omissions, Plaintiff suffered and continues to suffer: (a) reputational harm and stigma; (b) chilling of speech; (c) emotional distress and fear of escalated police encounters; (d) increased risk of forceful contacts; (e) time and expense to seek correction; and other general and special damages to be proven at trial.

# VII. ATTORNEYS' FEES

59.    Plaintiff seeks fees and costs under 42 U.S.C. § 1988 (if later represented) and all other applicable law.

# VIII. PRAYER

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants, and award:

A. Declaratory relief that Defendants' actions and retention of the 10-96 and "politically delusional" entries violate the First, Fourth, and Fourteenth Amendments;

B. Preliminary and permanent injunctions ordering Defendants to remove/expunge the entries and to implement written due-process safeguards for any caution coding (notice, evidentiary standards, medical verification where applicable, independent review, and prompt removal procedures);

C. Compensatory, nominal, and (against Shields) punitive damages in amounts to be determined by ;

D. Costs and fees under 42 U.S.C. § 1988 and applicable law; and

E. All other relief—legal or equitable—to which Plaintiff is justly entitled.

Dated: September 3, 2025

Respectfully submitted,

/s/ Deborah Swan
Deborah Swan, Pro Se
1318 Chesterpoint Dr

---

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of September 2025, a true and correct copy of the foregoing document was filed with the Clerk of Court using the Court's CM/ECF electronic filing system, which automatically serves notification of such filing upon all counsel of record, including:

**Daniel Plake**
Assistant County Attorney
Montgomery County Attorney's Office
1301 Sam Houston Avenue, Suite 100
Conroe, Texas 77301
Email: daniel.plake@mctx.org

Attorney for Defendants Deputy W. Shields and Montgomery County Constable Precinct 3, Texas.

Respectfully submitted,

---

**Deborah Swan**
Plaintiff, Pro Se