IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

DEBORAH SWAN,

    Plaintiff,

V.

United States Courts
Southern District of Texas
FILED

OCT 2 2 2025

Nathan Ochsner, Clerk of Court

DEPUTY W. SHIELDS, Individually and in his Official Capacity, and
MONTGOMERY COUNTY CONSTABLES PCT 3, TEXAS,
Defendants.

CIVIL ACTION NO. 4:25-cv-02799

# AFFIDAVIT OF DEBORAH SWAN

---

Introduction

I am a licensed private investigator, uniquely credentialed with dual board
certifications in Cyber Intelligence and Human Trafficking Investigations. I am
also an independent legal researcher and seasoned pro se litigant. My career
trajectory has not been a traditional one. While my legal degree and education were
earned from Liberty University, my investigative credentials alone place me among

a select group of trained professionals. My role as a litigant—forced into self-representation due to systemic failures in the legal system—distinguishes me as both a participant and a critic of judicial accountability in the United States.

My dual vantage point, as both investigator and litigant, enables me to approach cases with a rare combination of evidentiary rigor and firsthand knowledge of legal procedure. My work is not abstract research; it is lived experience, documented in court filings, exhibits, and personal testimony. This profile reconstructs my investigative path, from the origins of my legal battles in *Snook v. Swan* to my current federal case against the Montgomery County Precinct 3 Constable's Office in Texas. It highlights my methodology, discoveries, and the broader systemic issues I have uncovered, including false profiling, lawfare, and misuse of official databases.

---

Part I – Origins of Advocacy: The Charles Dyer Case

My first major step into legal advocacy emerged not from my own personal litigation but from my involvement in the case of U.S. Marine Sgt. Charles Dyer. Dyer, a decorated Marine and Iraq veteran, became a central figure during the Obama administration, when he rose to prominence as a spokesperson for the Oath Keepers, a controversial organization founded by Stewart Rhodes. At the time,

Dyer operated under the online handle "July4Patriot", and his YouTube channel gained immense popularity, surpassing one million subscribers. His message, directed at patriot and constitutionalist audiences, was sharply critical of government overreach, and it resonated with segments of the Tea Party and broader liberty movement.

Dyer's visibility led to direct conflict with federal authorities. During this time, the FBI made a calculated effort to recruit Sgt. Dyer as an undercover operative, was offered a deal: work covertly for two years to infiltrate and report on the Tea Party and Patriot communities. Dyer refused. That refusal set into motion a retaliatory effort, known as "lawfare"—a systematic use of legal and quasi-legal mechanisms to undermine his credibility, silence his voice, and erode his public reputation.

The consequences were swift and severe. Dyer faced escalating legal troubles, amplified by a false public narrative that framed him not as a dissident military veteran but as a dangerous right-wing extremist. The Southern Poverty Law Center (SPLC), along with mainstream media outlets, profiled the Oath Keepers as a white supremacist organization and placed Dyer at the center of this false characterization. The irony is that the Oath Keepers' original mission was framed in terms of constitutional defense, not racial ideology. Nonetheless, through

repetitive media framing, Dyer was transformed into a symbol of domestic extremism—an identity weaponized to justify his political destruction.

It was during my involvement and support in this case that I encountered the US Observer, an independent publication owned by Ed Snook. The US Observer outwardly claims to champion victims of government abuse, branding itself as a watchdog exposing corruption. I initially contacted US Observer and regarded them as a solution in uncovering the injustices surrounding Dyer's prosecution. After I hired Ed Snook, owner of the *US Observer*, and paid him $10,000.00, I sent him all of the exculpatory evidence supporting Sgt. Charles Dyer, along with a list of all the people involved in his false prosecution, which included undercover informants. We agreed that Snook would expose the public officials responsible for the false conviction, including the corrupt FBI and other government departments. However, after I provided him with this evidence of corruption, exposing government officials, Snook turned against me. He compromised himself, aligned with those same officials, and began to work against me. The man I hired to expose corruption instead became an adversary, and this betrayal became the stage for one of the most consequential battles of my life

---

Part II – *Snook v. Swan*: A Seven-Year Legal Ordeal

The case of *Snook v. Swan* (14CV0835) spanned more than seven years, draining resources and testing my resolve. The lawsuit centered on claims of defamation and reputational harm, but it revealed far more than interpersonal conflict—it unveiled a structural practice of manipulation and coercion that Snook himself admitted to in public statements.

According to his own public statements, letters he wrote to the Department of Justice, and Snook openly boasted publicly about using blackmail tactics as part of his journalistic enterprise. His methodology was twofold:

- Defense Narrative – portraying his publication as a last line of defense against abusive government actions, offering ordinary citizens a voice.
- Weaponization – gathering damaging information on officials and adversaries, which could be leveraged not only for stories but for political manipulation and control.

This dual model enables Snook to operate simultaneously as a watchdog and an extortionist, selectively deploying information to maintain leverage and influence. My own involvement with US Observer turned personal when Snook directly targeted me. He sent multiple emails to me and to many of my friends, explicitly stating that he had contacted his government connections and "opened a file" on me. He further claimed that he had dispatched his team to begin collecting

intelligence. His warning was blunt: because I refused to comply with his demands, he would "destroy" me.

My refusal to capitulate resulted in exactly what Snook promised—a campaign of public defamation, character assassination, and reputational harm designed to silence me. What distinguishes my case from many others, however, is the thoroughness of my documentation. Rather than fold under the weight of reputational and public attacks, I preserved evidence, filed motions, and pressed my case through the courts for nearly a decade.

The broader implications of *Snook v. Swan* are profound. It illustrates how information warfare, media manipulation, and personal intimidation can converge in the hands of a single actor with both a platform and a willingness to exploit the legal system. For me, it was the crucible that forged my dual identity as both investigator and pro se litigant.

---

Part III – Transition to Montgomery County Litigation

My more recent battles have unfolded in Texas, specifically against the Montgomery County Precinct 3 Constable's Office. Unlike my earlier conflict with

Snook, which was rooted in media defamation, my Texas litigation strikes at the heart of law enforcement accountability.

The case centers on the actions of Deputy Walter Shields, a constable whom I allege engaged in retaliatory profiling. Despite having never spoken with me, Shields reportedly entered my name into the official dispatch database with a "caution code" suggesting "political delusion." This designation, applied without medical evaluation or legal justification, functioned as an unofficial mental illness profile.

I argue that this kind of profiling is not only defamatory but also unconstitutional. It violates due process, stigmatizes individuals without evidence, and weaponizes mental health labels for political purposes. My discovery of the false entry was not incidental—it was the product of my methodical examination of dispatch logs, investigative cross-referencing, and my own cybersecurity expertise.

What I uncovered extended beyond my personal record. I documented a pattern: constables who had previously worked in Harris County, a Democratic stronghold, had transferred into Montgomery County, a community that outwardly identifies as conservative and supportive of the Trump administration. Yet once installed, some of these officers engaged in covert targeting of conservative residents such as myself, a Trump supporter, through false mental health profiling.

I posit that this apparent contradiction—professing conservatism while secretly undermining conservatives—represents a larger strategy of political control disguised as law enforcement. The weaponization of mental illness codes is an especially insidious tool, as it carries implications not only for reputation but for constitutional rights, firearm ownership, and future legal credibility.

Part I – Discovery of Illegal Access and Initial Investigation

1. In 2022, I first discovered repeated illegal access to my personal email accounts. I examined the security logs and metadata provided by my service provider and found hundreds of entries showing unauthorized logins from local IP addresses tied to residences within my neighborhood.

2. In addition to email intrusions, I discovered covert GPS trackers placed on my personal vehicle, allowing third parties to monitor my movements without my consent.

3. I deliberately allowed the activity to continue for nearly two years without changing my password, to document the pattern of unauthorized access. During this period, the metadata logs consistently showed logins from addresses in my immediate area, proving that my accounts were being accessed by individuals other than myself.

4. The metadata evidence included exact times, dates, and IP location data showing that my private emails were accessed repeatedly, with clear evidence that someone was sifting through my personal communications.

5. I contacted Detective Deuenberger, a law enforcement officer I had worked with previously on a civil deed fraud matter. After reviewing the metadata and hearing my account, Detective Deuenberger confirmed that the evidence showed a crime and advised me to report the matter.

6. On May 31, 2024, I experienced an incident with Christian Vera, who was connected to this ongoing pattern of harassment. This event further confirmed that I was being deliberately targeted and monitored.

7. In response to these intrusions, I delivered letters into the mailboxes of the specific addresses that appeared in my metadata logs. These addresses were tied to the logins to my accounts. I did this in an effort to notify those involved, establish a record, and hold individuals accountable.

8. After I delivered those letters, all unauthorized access to my email account stopped immediately.

9. The metadata also showed that one location appeared hundreds of times over the course of a year: the Homeowners Association office managed by Cynthia Griffith, located at 1323 Jander Drive, where the HOA parking lot was repeatedly flagged in my logs. The logs confirmed that my password

had been entered from this location and that my private emails had been accessed from there hundreds of times.

10. Instead of investigating these serious crimes, Deputy Walter Shields — who, according to a neighbor, routinely parks in the same HOA parking lot at 1323 Jander Drive — retaliated against me. After I notified six of the neighbors identified in my security metadata logs by delivering letters, Deputy Shields, with whom I have never spoken, contacted dispatch and immediately stated that I was a Code 10-96 with "political delusions." He then dispatched a mental health officer to my home under the pretext of an emergency detention..

11. A mental health officer named Harry Holman came to my residence, evaluated me, and expressly cleared me—stating in his official report that I did not meet the criteria for an emergency order.

12. At the time of this welfare check, I did not know who Deputy Shields was, or that I had been falsely profiled in the dispatch system as "dangerous" and suffering from "political delusions."

13. I only discovered this false profile afterward, when I filed a request to find out who had called the mental health unit to my home.

14. Immediately after the mental health officer cleared me, Deputy Shields who was not present, nonetheless contacted dispatch and instructed them to add

into the dispatch notes, that I am a 10-96 with political delusions, branding

me with a false label of "suicidal, dangerous, with political delusion" and

This was done without any medical evaluation, legal authority or

justification.

Part IV – The Discovery of Code 10-96 and "Political Delusion"

The turning point in my Texas litigation came when I first uncovered additional

fabricated and false dispatch entries falsely labeling me with the mental health

code 10-96 and the notation "political delusion." This was not the result of any

medical evaluation, psychiatric review, or judicial finding. Instead, it was the

product of personal opinions inserted into an official law enforcement

database—one designed to follow me indefinitely and shape every future encounter

with public officials.

When I sought to challenge the designation, I began by filing a complaint directly

with the Montgomery County Constable's Office. My request was straightforward:

I asked that the false mental illness profiles be removed from the dispatch records.

What I encountered was even more alarming than the false entry itself. I was told

by Captain Atkins, in no uncertain terms, that there was "no way to remove the

entries once they are recorded" into government databases. The implication was

chilling: even if the entry were false, defamatory, or unsupported by evidence, it

would remain there permanently—accessible to law enforcement, courts, and other agencies who might later rely upon it.

This revelation underscored the severity of the issue. A single deputy's personal bias and retaliatory motives could be immortalized as fact, with no internal mechanism for correction. In my words, it was a bureaucratic death sentence, branding me with an unearned stigma that could affect everything from traffic stops to court credibility to my constitutional right to bear arms.

---

Part V – Court Filings and the Role of County Attorney Daniel Plake

When I filed suit to challenge the false profiling, the issue escalated into federal litigation. Representing Montgomery County and Deputy Walter Shields is Assistant County Attorney Daniel Plake, whose role should have been to defend the county's legal position within the bounds of professional responsibility. Yet, I document and the court records reveal that Plake went further.

Instead of treating the false entries as administrative errors or matters requiring neutral legal defense, Plake himself adopted and amplified the false defamatory narrative. In court filings, he asserted that I suffered from mental illness with "political delusions"—echoing the very language of the false dispatch record.

Rather than addressing the lack of due process in assigning mental health labels, and that constables have zero legal authority to profile a person with a dangerous mental illness, he unlawfully stated the Mental Health Code, by manipulating the legal definition of what the code actually states, and using this manipulated false version he created, and stating the Mental Health Code gives police officers authority to profile individuals when the code actually states the exact opposite. Here is the exact argument that Daniel Plake has made: Plake's filings entrenched them in the court record, effectively laundering falsehood into an "official" narrative.

Even more troubling, I note that these filings did not stop at legal argument but mocked my personal political beliefs. Court records allegedly include commentary ridiculing me for wearing a Donald Trump baseball cap, and repeating claims that I believed Democrats were "out to harm" me as though these were symptoms of mental illness. For me, these characterizations are not only false but profoundly revealing of the contempt some public officials hold toward the very citizens they are sworn to serve.

What was originally a deputy's unverified entry in a database has, through litigation, evolved into a legalized stigma—one that cast my political identity as a form of pathology.

Part VI – Constitutional and Ethical Implications

The implications of this episode extend far beyond my personal case. At stake are fundamental questions of due process, equal protection, and the politicization of mental health labels.

- Due Process Violations – The insertion of a false mental health code without notice, hearing, or medical evaluation is a textbook violation of procedural due process. Citizens are entitled to know the accusations recorded against them and to contest them before they become part of their permanent government file.

- First Amendment Concerns – When political beliefs (support for Donald Trump, criticism of Democrats, etc.) are framed as evidence of delusion, the government crosses into dangerous territory. It is not the role of law enforcement or county attorneys to decide which political viewpoints are rational and which are pathological. Doing so constitutes viewpoint discrimination, a core First Amendment violation.

- Professional Ethics – For a licensed attorney, particularly one representing a government office, to mock or disparage a litigant's political beliefs in formal filings raises serious ethical concerns. Attorneys are officers of the

court and are bound by professional standards requiring candor, fairness, and respect. Plake's conduct, as I describe, exemplifies a degradation of those standards.

- Chilling Effect on Civic Participation – When citizens know that their political affiliations can be recorded as symptoms of mental illness, the natural response is self-censorship. This chilling effect undermines not only free speech but democratic engagement itself.

---

Part VII – Broader Significance

For me, the issue is not simply personal injury—it is systemic failure. If a county attorney can, in court filings, mock a litigant's political beliefs and repeat unverified mental health codes, then the public's confidence in impartial justice is fatally compromised.

My case illustrates how fragile civil liberties become when government databases, once corrupted, are insulated from correction. It demonstrates how unchecked law enforcement discretion can mutate into political retaliation. And it raises the question: what happens when attorneys, rather than correcting abuses, reinforce them?

My discovery of the 10-96 code and my subsequent litigation have become a case study in what I describe as "politicized mental health profiling." It is not merely a personal grievance but a warning about the trajectory of law enforcement practices in the United States, particularly in politically polarized environments where partisan loyalty can be weaponized against ordinary citizens.

---

Part VIII – New Revelations from Court Filings

The most recent filings by Montgomery County Assistant County Attorney Daniel Plake have revealed even more disturbing details about Deputy Walter Shields' conduct. In these records, Shields admits that he personally contacted his deputies and instructed them to place a 10-96 caution alert on my name and residential address. This was not an incidental or clerical error; it was a deliberate act of classification that attached to my official record, branding me as mentally unstable and "politically delusional."

More troubling still, Shields' actions extended beyond the database. According to the filings, he contacted my neighbors directly, warning them to "lock their doors" if they saw me near their homes. He further instructed them to record and document any interactions involving me and to report those details back to him.

This pattern of behavior moves far beyond mere misjudgment—it represents a coordinated effort to stigmatize and isolate me within my own community. By deputizing my neighbors as informal surveillants, Shields created an environment of suspicion and hostility, effectively turning me into a social pariah based on unverified and politically motivated profiling.

---

Part IX – Implications of Community Surveillance

The revelations about Shields' conduct highlight several critical issues:

- Expansion of False Profiling into Community Policing – What began as a false database entry metastasized into a system of community surveillance. Shields did not merely record me as mentally ill; he sought to actively enforce that stigma by mobilizing my neighbors against me.

- Violation of Privacy and Reputation Rights – By spreading false claims to neighbors, Shields inflicted reputational harm outside any judicial process. This conduct echoes the very defamation tactics I had battled in *Snook v. Swan*, demonstrating continuity in how reputational destruction can be used as a weapon.

- State-Sanctioned Ostracism – Law enforcement carries unique authority. When a deputy instructs neighbors to monitor and report on a private citizen,

it transforms ordinary residents into extensions of state surveillance, eroding the boundary between community and government oversight.

- Chilling Effect on Neighborhood Relations – My neighbors, now primed to view me as dangerous or delusional, were placed in a position of distrust. This not only isolated me but destabilized the broader fabric of community relations, replacing mutual trust with suspicion dictated from above.

---

Part X – The Broader Pattern of Weaponized Law Enforcement

These disclosures further validate my larger thesis: that law enforcement discretion, when unchecked, can be weaponized for political and personal purposes. The 10-96 caution alert, the mocking filings by county attorney Plake, and the community instructions issued by Shields form a continuum of harassment that transcends administrative misconduct.

In my case, the message to the public is unmistakable: support for conservative political causes—particularly my defense of Sgt. Charles Dyer and my visible support for Donald Trump—can be recast by officials as evidence of mental instability. Once that label is applied, it justifies further intrusion, stigmatization, and surveillance, creating a closed loop where dissent itself becomes criminalized

under the guise of "mental health concerns."

---

Part XI – Legal Analysis: False Profiling, Retaliation, and Constitutional Rights

The circumstances I uncovered engage multiple constitutional protections.

- Reputation and "Stigma-Plus" Doctrine – Paul v. Davis

  The false 10-96 mental health designation and "political delusion" label meet the "stigma-plus" threshold. The stigma is clear: I have been branded in official databases as mentally ill. The "plus" lies in the fact that this designation alters my legal status, affects law enforcement encounters, threatens my Second Amendment rights, and undermines my credibility in litigation.

- Retaliation for Political Beliefs – Nieves v. Bartlett

  Shields and Plake's actions—recording false codes, mocking my Trump support, and mobilizing neighbors—constitute retaliation for protected political expression, a First Amendment violation.

  Fabricated Evidence and Due Process – Mooney v. Holohan and Napue v. Illinois

  Fraudulent dispatch entries and their adoption in court filings parallel the use of fabricated evidence, violating due process.

- Equal Protection – Village of Willowbrook v. Olech

  I was singled out as a "class of one," targeted for my political identity
  without a rational basis.

---

Part XII – Comparative Examples of Profiling and Lawfare

While my case is deeply personal, it fits into a broader pattern of mental health
stigmatization and lawfare tactics used to silence dissent.

- Lawfare Against Political Dissidents – I have firsthand experience with how
  prosecutions, database entries, and defamation can be used to neutralize
  political opponents.

- Mental Health Labels as Political Weapons – My experience parallels
  historical abuses where regimes discredited opposition by pathologizing
  belief.

- Modern U.S. Parallels – Fusion centers and watchlists illustrate similar risks.
  Montgomery County's targeting of me reflects these concerns locally.

- Chilling Effect on Community Engagement – Instructing neighbors to
  monitor me eroded trust and deterred open political participation.

---

Part XIII – Conclusion: A Call for Accountability and Reform

My journey—from investigator to pro se litigant battling false profiling—shows how fragile constitutional protections become when state power is abused.

Transparency in databases, scrutiny of political profiling, professional accountability for attorneys and deputies, and public awareness are essential reforms.

In the end, my mission is grounded in truth, due process, and citizen advocacy. What was intended as a campaign of defamation is now part of the public record. My case is not simply a personal battle but a constitutional warning and a civic call to action.

_Deborah Kay Swan_

Deborah Kay Swan

State of Texas

County of Dallas

Sworn to and subscribed before me

on 10/22/2025 by Deborah Kay Swan.

Mohiuddin Ahmed

ID NUMBER
135049971
COMMISSION EXPIRES
August 20, 2028

Mohiuddin Ahmad

Electronically signed and notarized online using the Proof platform.